United States District Court
Middle District of Florida
Tampa Division

**ARLENE BROWN,**

    *Plaintiff,*

v.                                                                           No. 8:19-cv-1501-T-PDB

**COMMISSIONER OF SOCIAL SECURITY,**

    *Defendant.*

_____

# Order

Arlene Brown brings this action under 42 U.S.C. § 1383(c) to review a final decision of the Commissioner of Social Security denying her application for supplemental security income. Under review is a decision by an Administrative Law Judge ("ALJ") dated May 31, 2018. Tr. 9–28. Summaries of the law and the administrative record are in the ALJ's decision, Tr. 12–23, and the parties' briefs, Docs. 26, 27, and not fully repeated here. Brown contends the residual functional capacity ("RFC") is not supported by substantial evidence and the ALJ erred in considering medical opinions. Doc. 26.

### I.    Background

Brown applied for benefits in November 2015, alleging she had been disabled since October 2014 because of mental and physical impairments. Tr. 75–76. The ALJ found she has severe impairments of carpal tunnel syndrome, radiculopathy, degenerative disc disease of the spine, osteoarthritis, generalized anxiety disorder, and depressive disorder. Tr. 14.

Brown regularly saw Ivan Ramos, M.D., for her physical problems. *See* Tr. 341–359. Dr. Ramos referred her to Siddharth Shah, M.D., with Bay View Neurology,

for additional treatment. *See* Tr. 327. Neither doctor completed a disability form or evaluation.

Brown saw two doctors for consultative exams related to her application for benefits: Robert Young, Ph.D., and Bryan Thomas, M.D.

Brown visited Dr. Young for a mental-status evaluation in February 2016. Tr. 400–03. He documented her description of her symptoms and observed her facial expressions "generally reflected a dysphoric mood" and her "energy level appeared normal." Tr. 400.

Dr. Young stated Brown was cooperative, gave "adequate effort" in responding to questions, maintained steady eye contact, answered questions in a straightforward manner, gave "reasonably well detailed" responses without difficulty recalling personal information, was willing to discuss personal history, and was comfortable with the interview and examination process. Tr. 400. He observed she "spoke almost non-stop in-between examiner's questions often talking about various areas of her life often unrelated to the questions at hand. Most of her rambling had to do with her life problems and other challenges she is facing." Tr. 400. He reported she had no difficulty interacting with staff and was a reliable historian. Tr. 400. He estimated her intellectual level is in the average range based on education level, spelling, vocabulary usage, and "fund of knowledge." Tr. 400–01.

Dr. Young stated Brown "never had any difficulty maintaining her attention and concentration during the clinical interview although she often was tangential in conversation." Tr. 401. He stated she "never manifested" impulsivity, distractibility, or hyperactivity; evidenced no perceptual disorder; had no language deficits and spoke in a normal tone and pace of voice; had average vocabulary and could "engage in spontaneous conversation"; had judgment, insight, and abstract reasoning consistent with someone with average intelligence; and had a dysphoric mood with a "corresponding depressed affect." Tr. 401.

Dr. Young reported Brown scored a 30 out of 30 in a "Mini Mental State Examination," suggesting no cognitive impairment. Tr. 402. He reported she correctly completed simple math problems, like making change, without using a paper and pencil. Tr. 402. On the Wechsler Adult Intelligence Scale "digit span task," he reported she scored in the ninth percentile, "which is within the very end of the low average range." Tr. 402.

Under "Diagnostic Impressions," Dr. Young wrote major depressive disorder, single episode, moderate; and anxiety disorder not otherwise specified. Tr. 402. Next to "Summary & Recommendations," Dr. Young wrote:

> Arlene's presentation was consistent with her self-report. Collectively she came across as a moderately depressed adult female who appears to be struggling to cope with her present life circumstances especially her physical health problems and perceived inability to work. Although her claim for social security disability benefits is based on both physical health and psychiatric health problems her physical health complaints are the primary reason for her perceived inability to work. She should continue to participate in comprehensive psychiatric care to include both medication management and adjunctive psychotherapy. Should medical personnel deem her physical health problems not significant enough to impair her ability to sustain employment, she would likely benefit from a referral to vocational rehabilitation. Arlene appears to have adequate social support from her daughter and reasonable coping skills and therefore is not believed to be at risk for any imminent behavioral or emotional decompensation. She denied any past inpatient psychiatric admissions or suicide attempts.
>
> Medical personnel will have to comment on the veracity of her physical health problems and the severity of their impact on her ability to work. At the present time her claim for Social Security disability benefits appears to be foremost a medical decision. Arlene's psychiatric symptoms appear significant enough to produce a moderate degree of work related interference. Her prognosis is guarded with mediating factors being the severity and course of her physical health and psychiatric health problems and her personality features.
>
> Arlene appears competent to manage her own funds.

Tr. 402–03.

Brown visited Dr. Thomas in May 2016. Tr. 422–27. In his report, under "History of Present Illness," he wrote neuropathy in hands and feet, carpal tunnel, back and neck problems with cervical and lumbar spondylosis, and depression. Tr. 422. Under "Review of Systems" and "Functional Limitations," he recorded Brown's subjective reports about her symptoms and limitations. Tr. 423.

Dr. Thomas examined Brown and noted no abnormalities in her head, eyes, ear, nose, throat, neck, cardiovascular system, lungs, abdomen, or skin. Tr. 424. Next to "Extremities," he wrote, "There was no clubbing, cyanosis, or edema." Tr. 424. Under "Neurologic" and next to "General," he wrote, "Patient was alert and had good eye contact and fluent speech. Mood was appropriate and she had clear thought processes. Patient's memory was normal and concentration was good. The patient was oriented to time, place, persons and situation." Tr. 424. Next to "Cranial Nerves," he wrote, "Cranial nerves 2-12 were grossly intact." Tr. 424. Next to "Cerebellar," he wrote, "The patient had an asymmetric, antalgic gait favoring the right without an assistive device. Hand eye coordination was good." Tr. 424.

Under "Muscles," Dr. Thomas noted Brown had either 4 or 5 (out of 5) strength in all areas, except he added "Low back pain" with right hip extension and "Pain" with right ankle plantar flexion. Tr. 425. Next to "Nerves," he wrote, "Sensory examination was decreased at bilateral upper extremities from the elbows down, bilateral lower extremities from the knees down. The patient's straight leg test was negative bilaterally." Tr. 425. He observed she had symmetric reflexes, showing "2+" for all of them. Tr. 425.

In a musculoskeletal exam, Dr. Thomas reported Brown had sacroiliac joint and left trochanteric tenderness and no joint swelling, erythema, effusion, tenderness, or deformity. Tr. 425. He reported she could lift, carry, and handle light objects; "perform fine motor skills such as opening doors, buttoning shirts, [and] manipulating a coin"; and squat, but he observed she rose from a squatting position with moderate difficulty. Tr. 425. He reported she could rise from a sitting position

4

without assistance and get up and down from the exam table without difficulty. Tr. 425. He observed she "was unable to walk on heels and toes," had abnormal tandem walking, and could stand and hop on one foot bilaterally. Tr. 425. He reported she could dress and undress "adequately well." Tr. 425. He reported she was cooperative and gave a "fair effort" during the exam. Tr. 425.

Under "Impressions," Dr. Thomas wrote, "Claimant presents to KLM alleging disability due to neuropathy in hands and feet, cervical spondylosis, lumbar spondylosis, bilateral carpal tunnel syndrome and depression." Tr. 426. He repeated each impairment with information next to it:

> Neuropathy in hands and feet: Claimant is not sure what caused this problem. No acute injuries have occurred per her recollection. Current symptoms include pain, burning and weakness in the bilateral hands and feet from the elbows distally and the knees distally. Nothing but prescription medications improves these symptoms. Movement worsens them. She reports have difficulty writing and weakness in the hands with frequent dropping of items. She is a 48-year old female in no acute distress. She looked tearful when I entered the exam room; however, she was alert and oriented with good eye contact. Speech was fluent. She reported bilateral sensory impairments over the upper and lower extremities, the decreased sensation of light touch in the upper arms which was from the elbows distally and in the lower extremities from the knees distally. However, there were no rashes or lesions noted. Bilateral Tinel's signs at the wrist and elbows were negative. There was no atrophy of the intrinsic hand muscles noted. No tenderness to palpation, however, she had a dramatic reaction to wrist extension bilaterally with the left greater than the right exacerbating her pain. The numbness reported is in a symmetric ascending fashion with no dermatomal pattern. Grip strength was 4/5 and symmetric bilaterally. She is a right hand dominant female.

Tr. 426.

Dr. Thomas continued,

> Carpal tunnel syndrome: She reports this has been going on for years. Symptoms include pain and weakness which is improved by medications. She reports inability to use her hands and difficulty

5

> writing. As stated before, Tinel's sign was negative bilaterally at the wrists and elbows. She reports sensory changes, but no dermatonal pattern, consistent with neuropathy which is difficult to distinguish with her reports of carpal tunnel syndrome. She would benefit from an EMG study in order to better delineate the source of her sensory changes and pain. No noted effusion, tenderness to palpation to specific joints in the hand or muscular atrophy at this time. Her proximal muscle strength is 5/5 in bilateral upper extremities.

Tr. 426.

Dr. Thomas continued,

> Back and neck pain: This is associated with lumbar and cervical spondylosis. The patient reports multiple degenerative disks disease and osteoarthritis in the cervical and lumbar spine. Her pain is primarily in the neck and low back. She does endorse muscle spasms and shooting pains down her legs. On exam today, she has an asymmetric antalgic gait favoring the right leg with no assistive devices at this time. Reflexes are +2 and symmetric throughout bilateral upper and lower extremities. [S]he has 5/5 strength in bilateral upper extremities except for handgrip which is 4/5 and she has reduced hip flexion and extension in bilateral lower extremities secondary to low back pain, as well as reduced right ankle plantar flexion secondary to toe pain. **However, she was able to briefly stand on her toes and heels during gait assessment**. Straight leg raise test was negative bilaterally, although she had some left trochanteric tenderness, as well as significant SI joint pain with palpation, right greater than left. She was able to perform a squat with moderate difficulty requiring her hands in order to assist upon rising. She was able to rise from a seated position without assistance and had no difficulty getting up and down from the exam table. Tandem walking is abnormal due to poor balance. She could briefly stand, but not hop, on one foot bilaterally. She was cooperative and gave fair effort throughout the examination. Range of motion was full and within normal limits, although she does report significant shoulder discomfort when reaching overall and was unable to maintain it for prolonged periods of time.

Tr. 426–27 (emphasis added).

Dr. Thomas concluded,

> Depression: She reports this began after a prolonged custody battle for her children. She reports trouble sleeping at night secondary to nightmares, difficulty with crying spells and poor appetite. She is currently on medications for depression and is going to receive psychiatric evaluation later this month on the 14th. She does report a history of both physical and sexual abuse. She states that her depression at this time makes her very emotional and frustrated and she has a lack of patience and inability to focus. She reports frequently hiding from her daughters so they do not see her crying. Again, she was alert and oriented today during the interview. She made good eye contact and speech was fluent. Mood was appropriate and thought processes were clear. Memory and concentration appeared intact. She was tearful upon me entering the room, but was conversant and able to maintain a conversation without difficulty. No suicidal or homicidal ideations at this time.

Tr. 427.

In a range-of-motion report, Dr. Thomas documented that Brown's range of motion was within normal limits. Tr. 428–30.

Considering the "Paragraph B" criteria, the ALJ found Brown has a mild limitation in understanding, remembering, or applying information; a moderate limitation in interacting with others; a moderate limitation in concentrating, persisting, or maintaining pace; and a moderate limitation in adapting or managing oneself. Tr. 16.

The ALJ found Brown has the RFC to perform light work with additional limitations:

> [S]he can stand and/or walk up to four hours in an 8-hour workday; occasionally climb ramps and stairs but never climb ladders, ropes and scaffolds. She can frequently balance, occasionally stoop, kneel, crouch and crawl; and can have occasional exposure to vibration. The claimant can occasionally reach overhead; and frequently handle and finger, bilaterally. She can also have occasional exposure to extreme cold and wetness, and occasional exposure to hazards such as moving mechanical parts of equipment, tools or machinery. In addition, the claimant can understand, carryout and remember simple instructions in two hour increments sufficiently enough to complete an eight hour workday, in

7

>an environment that does not involve fixed production quotas. She is limited to only occasional changes in the work setting and can have occasional interaction with the general public.

Tr. 17.

>The ALJ added,

>>In sum, the above [RFC] assessment is supported by the evidence of record in that the claimant is limited to a range of unskilled, light exertion with postural, manipulative, environmental, and mental restrictions. However, the nature of her treatment, the objective findings, and the claimant's own statements about her daily activities do not support a more restrictive finding. For example, while the notes indicate that the claimant had mildly decreased sensations in the lower extremities, a thorough review of the evidence fails to reveal that she used any type of assistive device to ambulate, required surgery or had balance problems (13F; 7F). In fact, the most recent records indicate that the claimant had no less than 4/5 lower extremity and maintained a steady gait, which suggests that the claimant is able to walk further than alleged (4F).

>>The record also does not support the claimant's extreme allegations that she cannot grip items. Instead, the examination showed negative Tinel's sign, bilaterally, and 5/5 grip strength. Likewise, the record showed that the claimant was able to lift and carry light items, and retained 5/5 muscle strength in the upper extremity. In addition, the claimant reported that she raises her 13-year-old daughter and takes care of a pet; arguably, if the claimant is able to take care of her daughter then she may not be as physically or mentally limited as alleged.

Tr. 20.

>The ALJ discussed Dr. Thomas's report:

>>Later in May 2016, the claimant attended a consultative examination with Dr. Bryan Thomas (7F). He noted that the claimant had negative straight leg raises and an antalgic gait but used no assistive device (7F/5). She also had decreased sensations in bilateral extremities from the knees downward; and reduced hip flexion and extension in bilateral lower extremities secondary to low back pain, as well as reduced right ankle plantar flexion secondary to toe pain (7F/4/5). However, she was able to stand on her toes and heels during gait assessment. Straight leg

> raise testing was negative bilaterally, although she had some left trochanteric tenderness, as well as significant SI joint pain with palpation, right greater than left. In addition, the claimant was able to perform a squat with moderate difficulty requiring her hands in order to assist upon rising. She was also able to rise from a seated position without assistance and reflexes were +2 and symmetric throughout the bilateral upper and lower extremities (7F/5).
>
> Although the claimant had decreased sensation of light touch in the upper arms, from the elbows distally but had 5/5 muscle strength in the upper extremities (7F/4/5) [sic]. Dr. Bryan Thomas further noted that the claimant had 4/5 grip strength bilaterally and 5/5 finger abduction bilaterally but there were no signs of hand tenderness or atrophy in the hand muscles (7F/4/5). In addition, bilateral Tinel's signs at the wrist and elbows were negative and she was able to perform fine motor skills such as opening doors, buttoning shirts, manipulating a coin, (7F/5/4). She was also able to lift, carry, and handle light objects; and her range of motion in the cervical and lumbar spine and shoulder were within normal limits (7F/7).

Tr. 18–19.

After describing Dr. Young's report, Tr. 19, the ALJ stated, "Dr. Robert Young opined that the claimant's psychiatric symptoms appeared significant enough to produce a 'moderate' degree of work related interference (5F/4). However, due to the ill-defined definition of the term moderate, the undersigned grants this opinion little weight (5F)." Tr. 21.

The ALJ discussed other opinions by state-agency consultants:

> [T]he state agency psychological consultant[']s [Judith Meyers, Psy.D.'s] … opinions are generally consistent with the medical evidence of record. However, since the consultants used the previous standards in evaluating the "B" criteria, their opinions are granted some weight.
>
> The opinions of the State agency physical consultant, Dr. Jesse Palmer are consistent with the overall objective medical evidence of record and therefore the opinions [are] given great weight[.] However, the undersigned has added additional physical limitations.

Tr. 20–21.

9

## II. Standard

A court's review of a decision by the Commissioner is limited to whether substantial evidence supports the factual findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoted authority omitted). The "threshold for such evidentiary sufficiency is not high." *Id.*

## III. Law & Analysis

### *A.* *RFC*

Brown argues the RFC is not supported by substantial evidence, pointing "particularly [to] Dr. Shah's treatment notes, the results of the objective testing Dr. Shah ordered, and the consultative exam[] report from Dr. Thomas." Doc. 26 at 10.

A claimant's RFC is the most she can still do despite her limitations. 20 C.F.R. § 416.945(a)(1). The Social Security Administration uses the RFC at step four to decide if the claimant can perform past relevant work and, if not, at step five with other factors to decide if there are other jobs in significant numbers in the national economy she can perform. *Id.* § 416.945(a)(5). The "mere existence" of an impairment does not reveal its effect on a claimant's ability to work or undermine RFC findings. *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005).

An ALJ must consider all relevant record evidence. *Id.* § 416.920(a)(3). But "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [the Court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal quotation marks omitted).

"[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). An erroneous factual statement by an ALJ may be harmless if the ALJ applies the proper legal standard. *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983); *Majkut v. Comm'r of Soc. Sec.*, 394 F. App'x 660, 665 (11th Cir. 2010).

Here, contrary to Brown's argument, substantial evidence supports the RFC. As the Commissioner observes,

> [Brown's] examinations from the end of 2015 through 2016 show that she had a normal or slow and steady gait, mostly full strength in her upper and lower extremities, normal sensation, and normal range of motion in all joints, demonstrating no acute focal motor deficit (Tr. 18, 20, 320, 342, 366, 377–78, 379, 400, 413, 454, 456, 458, 460, 462, 524, 526, 528, 567, 570). The MRIs of [Brown's] lumbar and cervical spine show mild or minimal abnormalities (Tr. 18, 337, 339).

Doc. 27 at 5.[1] "[Brown's] examinations from 2017 reflect mixed findings, but include findings of normal range of motion, normal sensation, and normal gait (Tr. 19, 20, 450, 452, 522, 553, 558, 562)." Doc. 27 at 6. "As far as her mental abilities, Plaintiff exhibited psychiatric symptoms such as anxiety and depressed mood, but examinations still show she was cooperative and had normal memory, normal attention and concentration, normal thought process, normal speech, and normal insight and judgment (Tr. 16, 19–20, 342, 43, 424, 450, 452, 454, 456, 458, 460 462, 499, 516, 567, 570)." Doc. 27 at 6.

Brown references some of Dr. Shaw's reports, citing nerve conduction studies that were "abnormal" and "consistent with a left S1 radiculopathy" (Tr. 330); electrodiagnostic results showing abnormal numbers for her right ankle and right plantar; a lumbar MRI showing disc desiccations at L5-S1, a posterior annular tear,

---

[1]Some of Dr. Shaw's reports are cited more than once because some appear in the record twice (in different exhibits).

11

and spondylolisthesis; and physical exam results like diminished deep tendon reflexes and strength in upper and lower extremities. Doc. 26 at 11.

That evidence does not mean the RFC is not supported by substantial evidence. The ALJ recognized Brown had impairments and accordingly found a restrictive RFC, including only occasionally reaching overhead. While the evidence shows Brown suffers limitations from impairments, Dr. Shaw's reports also document what the Commissioner described in part: slow and steady gait, *see, e.g.*, Tr. 320; recommendations to continue medication, *see, e.g.,* Tr. 321, or referrals to pain management, *see, e.g.,* Tr. 378; and, in the most recent exam with him in May 2017, "stable" motor and sensory exams (though decreased sensations are noted), *see, e.g.,* Tr. 522. MRI imaging of her cervical spine showed mild hypertrophic changes, Tr. 336, MRI imaging of her lumbar spine showed a mild disc bulge with minimal to mild bilateral neural foramina stenosis, Tr. 339, and no "rotator cuff partial or full-thickness tear" but an "abnormal signal … with degeneration/intrasubstance tear" and thickening ligament suggesting chronic sprain in the left shoulder, Tr. 395. Dr. Shaw's reports were only one part of the record the ALJ considered in the RFC. The Court "may not decide facts anew [or] reweigh evidence." *See Moore*, 405 F.3d 1208 at 1211 (quoted).

Brown contends that although the ALJ referenced some findings from Dr. Thomas's report, the findings do not support that she can stand and walk for four hours or handle and finger frequently, the ALJ failed to include all findings, and the ALJ inaccurately described them. Doc. 26 at 11–13.

On failing to include all findings, Brown points to Dr. Thomas's observation that her tandem walk was "abnormal due to poor balance" though the ALJ later stated evidence showed she had no balance problems; Dr. Thomas's observation she could not hop; and his observation she had a dramatic reaction to bilateral wrist extension. Doc. 26 at 12 (citing Tr. 20, 426–27). On inaccuracies, Brown points to the ALJ's statement that in the exam she could stand on her toes and heels even though

12

Dr. Thomas observed she was "unable to walk on heels and toes." Doc. 26 at 12 (citing Tr. 425). She adds, "Being able to perform these manipulative activities [opening doors, buttoning shirts, manipulating a coin] at an exam does not equate to being able to perform them frequently or from one third to two thirds of a day." Doc. 26 at 13. Relatedly, she contends the ALJ failed to consider her medical condition as a whole, citing only a few favorable positive findings. Doc. 26 at 15.

Brown shows no reversible error. The ALJ did not repeat each medical record; her discussion of the evidence, *see* Tr. 17–21, shows she considered Brown's condition as a whole. *See Dyer*, 395 F.3d 1206 at 1211. As discussed, the record includes more than just a few favorable positive findings. The ALJ's potentially inaccurate factual statement about balance based on a remark from Dr. Thomas does not render all the other reasons supporting the RFC invalid. And the ALJ correctly cited Dr. Thomas's report that Brown could stand—as opposed to walk—on her heels and toes, *see* Tr. 18, 426. Dr. Thomas's findings combined with the other evidence discussed adequately support the RFC findings.

Brown argues neither Dr. Thomas nor Dr. Young were asked to complete physical or mental assessment forms, and though their reports document some normal findings, they also document abnormal findings that render the RFC unsupported by substantial evidence. Doc. 26 at 13–14. She argues the ALJ should have re-contacted them to complete functional-assessment forms or ordered new examinations, also with functional-assessment forms. Doc. 26 at 14. She argues part of the reason the ALJ should have re-contacted them is because her treating physician, Dr. Ramos, never provided functional limitations. Doc. 26 at 14. (She contends he offered one opinion when he said she had "moderately severe depression." Doc. 26 at 14 (citing Tr. 556, 558).) These arguments are unpersuasive. The record contained sufficient evidence to determine disability, which made re-contacting any doctor unnecessary.

Brown observes the ALJ stated she "maintained a steady gait" but Dr. Shah's treatment notes usually say she had a "slow steady gait," which she argues "begs the questions of whether she could walk at an adequate pace," and she argues her ability to perform some activities of daily living does not mean she can work eight hours a day. Doc. 26 at 15–16. These arguments also are unpersuasive. The ALJ discussed daily activities (like Brown's ability to take care of her daughter) as one of many reasons supporting the RFC. Brown provides no authority or reason that a "slow steady gait" would be inconsistent with a reduced range of light work. And other exams document normal movement.

Remand to reconsider the RFC is unwarranted.

## B.   *Medical Opinions*

Brown contends the ALJ erred in her consideration of medical opinions. Doc. 26 at 16–19.

Regardless of its source, the Social Security Administration "will evaluate every medical opinion" it receives.[2] 20 C.F.R. § 416.927(c). "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of … impairment(s), including … symptoms, diagnosis and prognosis, what [one] can still do despite impairment(s), and … physical or mental restrictions." *Id.* § 416.927(a). An opinion on an issue that is dispositive of a case, such as whether a claimant is disabled or able to work, is not a medical opinion because it is an opinion on an issue reserved to the Commissioner. *Id.* § 416.927(d)(1).

An ALJ "must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176,

---

[2]"For claims filed … before March 27, 2017, the rules in [20 C.F.R. § 416.927] apply. For claims filed on or after March 27, 2017, the rules in [§ 416.920(c)] apply." 20 C.F.R. § 416.927. Because Brown filed her claim for supplemental security income before March 27, 2017, the rules in § 416.927 apply here.

14

1179 (11th Cir. 2011). If an ALJ does not "state with at least some measure of clarity the grounds for his decision," a court will not affirm simply because some rationale might have supported it. *Id.*

An ALJ's determination may be implicit, but the "implication must be obvious to the reviewing court." *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir. 1983). Failure to explicitly state the weight given to an opinion is harmless if the opinion is consistent with the ALJ's decision and the decision is in-depth, shows thoughtful consideration of the findings, and does not leave the court wondering how the ALJ reached his decision. *Colon v. Colvin*, 660 F. App'x 867, 870 (11th Cir. 2016); *see also East v. Barnhart*, 197 F. App'x 899, 901 n.3 (11th Cir. 2006) (any error in failing to explicitly address consulting psychologist's report was harmless because observations in report were consistent with the ALJ's determination).

Brown states, "The ALJ failed to state what weight he assigned to either Dr. Thomas' findings or Dr. Young's findings when they conducted consultative examinations of Ms. Brown." Doc. 26 at 16. She then states, "The ALJ rejected [Dr. Young's opinion that psychiatric symptoms would moderately interfere with work] … due to the ill-defined definition of the term moderate[.] This is where the ALJ had a duty to recontact Dr. Young and have him complete a mental functional assessment form." Doc. 26 at 16. She contends the error is "compounded" because the ALJ failed to acknowledge a statement from Dr. Young that her prognosis is guarded and that she would benefit from vocational rehabilitation. Doc. 26 at 17 (citing Tr. 403). She contends other than the statement rejecting Dr. Young's opinion, "the ALJ does not state what weight he assigns to any of the doctors' finding and diagnosis, both treating and consultative examining doctors." Doc. 26 at 16.

These arguments are unpersuasive. Brown observes the ALJ discussed Dr. Young's opinion (psychiatric symptoms appeared significant enough to produce a "moderate" degree of work related interference) and gave the opinion little weight because the opinion's meaning for functional limitations was unclear. Tr. 403. The

15

ALJ was not required to re-contact Dr. Young for the reasons discussed. And the ALJ incorporated mental limitations in the RFC to accommodate Brown's severe impairments of depression and anxiety. A suggestion that Brown would benefit from vocational rehabilitation does not undermine the RFC with restrictive limitations or the ALJ's treatment of Dr. Young's opinion.

Brown points to no specific opinion in Dr. Thomas's report beyond his objective findings or her subjective report of symptoms. The ALJ failed to state the weight given to any opinion in Dr. Thomas's report. But any error is harmless because the weight is implicit and does not leave the Court wondering how the ALJ reached the decision. The ALJ thoroughly discussed the exam and clearly credited that Brown could perform certain activities with limitations. Brown identifies no other opinion from a treating or consultative doctor that the ALJ should have weighed other than Dr. Ramos's statement from one visit that she has "moderately severe depression," Doc. 26 at 14, an impairment the ALJ found severe and accounted for.

Brown contends opinions by state-agency consultant Dr. Meyers are not discussed or accounted for in the RFC (opinions that Brown would have moderate limitations in maintaining attention and concentration, responding appropriately to changes in the work setting, and completing a normal work day and performing at a consistent pace without an unreasonable number and length of rest periods). Doc. 26 at 17–18. Brown contends the ALJ had a duty to discuss Dr. Meyers's findings with particularity and explain the weight given to them because she gave no controlling weight to any other treating or examining physician. Doc. 26 at 18.

Contrary to Brown's contentions, the ALJ found Dr. Meyers's opinion generally consistent with the evidence and gave it some weight. Dr. Meyers's opinion is consistent with the ALJ's "Paragraph B" findings, and those findings are consistent with the RFC. The ALJ included several limitations in the RFC to accommodate concentration and other mental issues, limiting Brown to understanding, carrying out, and remembering simple instructions in two hour increments sufficiently enough

16

to complete an eight-hour workday in an environment that does not involve fixed production quotas and limiting her to only occasional changes in the work setting with occasional interaction with the general public. The argument disregards Dr. Meyers's narrative explanation: "[Brown] can complete simple and complex tasks, and can maintain [concentration, persistence, pace] throughout the work day with ordinary supervision. Mood, anxiety, and physical pain [] may occasionally intrude on concentration." Tr. 100.

Brown states, "The only opinions the ALJ states the weight given, are the opinions of the state agency non-examining consultants," and cites law that opinions of non-examining, non-treating doctors do not provide good cause to reject a treating physician's opinion or provide substantial evidence to support a decision. Doc. 26 at 19. The ALJ stated the weight given to Dr. Young's opinion and did not err in failing to explicitly state the weight given to any opinion by Dr. Thomas. The ALJ did not rely on the state-agency consultants' opinions to reject other opinions—including by any treating physician; the ALJ relied on the entire record.

## IV.  Conclusion

The Court **affirms** the Commissioner's decision and **directs** the clerk to enter judgment for the Commissioner and against Arlene Brown and close the file.

**Ordered** in Jacksonville, Florida, on September 30, 2020.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:   Counsel of record